UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.W.,<br><br>                 Plaintiff,<br><br>        v.<br><br>ANDREW SAUL,<br><br>                 Defendant. | Case No.  19-cv-06673-JCS<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 30 |

## I.    INTRODUCTION

Plaintiff T.W.[1] brings this action challenging the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner") finding her no longer disabled, and thus no longer eligible for disability benefits and supplemental security income.  The parties filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, T.W.'s motion is GRANTED in part, the Commissioner's motion is DENIED, and the case is remanded for further administrative proceedings consistent with this order.[2]

## II.    BACKGROUND

### A.    Medical History and Previous Determination of Disability

This summary focuses on the evidence cited by the parties and relevant to the resolution of the present motions; it is not intended as a complete recitation of the administrative record or T.W.'s medical history.  The Court particularly focuses on T.W.'s mental health treatment, since that is the focus of T.W.'s motion and the primary basis for remand, although the degree of T.W.'s

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court<br>Northern District of California

impairment due to her epilepsy, endometriosis, and other health issues is also in dispute.

According to records created in connection with the more recent determination that her disability ended, T.W. was originally found disabled based on epilepsy as of May 1, 2000, and a decision dated March 15, 2010 determined that she continued to be disabled as of that date. *See* Admin. Record ("AR," dkt. 14) at 15, 101, 145, 653. Those earlier decisions are not included in the record.

At a neurology appointment with Dr. Garrick Amgott-Kwan, M.D., in July of 2012, T.W. expressed concern about that taking Keppra for her epilepsy because she believed that it was teratogenic (i.e., could interfere with pregnancy) and she was trying to get pregnant at the time. *Id.* at 470. Dr. Amgott-Kwan responded that taking multiple medications for epilepsy would increase risks of birth defects and that T.W. should continue taking only Keppra. *Id.* Dr. Amgott-Kwan noted that T.W. was "[s]lightly confrontational." *Id.* A note from an earlier encounter with another neurologist characterized T.W. as a poor historian. *Id.* at 468–69. T.W.'s "active problem list" included anger and adjustment disorder with depressed mood, in addition to her epilepsy and other physical conditions. *Id.* at 469.

Notes from an October 2013 physical examination by Dr. Christina Wang, M.D., again include anger and adjustment disorder with depressed mood in T.W.'s "active problem list." *Id.* at 508. Dr. Wang noted that T.W. had "been in/out of jail from her sister['s] partner telling police that she was abusive to him." *Id.* T.W. reported "depression but declined therapy and medication" because she "feels she can handle it," and denied ever having suicidal ideation. *Id.*

T.W. completed a function report in February of 2015, in which she reported issues with vertigo, epilepsy, and migraines. *Id.* at 347. She reported no issues with personal care, and that she could do a variety of housework and gardening without assistance. *Id.* at 348–49. She stated that she would go outside "[d]aily when not stressed or in seizure mode," that she visited with family members two or three times per week, and that she walked for an hour to a local park or recreation center daily. *Id.* at 350–51.

In March of 2015, Dr. Ute Kollath, Ph.D., conducted a complete psychological evaluation at the request of the Department of Social Services, for the purpose of evaluating T.W.'s disability

United States District Court
Northern District of California

1  status.  *Id.* at 658.  Dr. Kollath described T.W. as a "fair historian" who was "friendly and

2  cooperative," interacting appropriately with Dr. Kollath and not exhibiting any "bizarre behavior."

3  *Id.*  T.W. "denied any acute psychological distress which would interfere with her ability to work."

4  *Id.*  Dr. Kollath's findings were generally normal, including on multiple tests of cognitive ability,

5  although T.W. displayed an "anxious" affect.  *Id.* at 659–60.  Dr. Kollath assessed only mild

6  impairments with respect to ability to adapt to changes in job routine, withstand the stress of a

7  routine workday, and adapt to changes and stressors in a workplace setting, with no impairments

8  in other categories.  *Id.* at 661.  Based on their review of T.W.'s file in April and August of 2015,

9  non-examining psychiatric consultants Dr. R. Ferrell, M.D., and Dr. V. Meenakshi, M.D., reached

10  conclusions similar to Dr Kollath's, assessing no more than mild mental limitations and only non-

11  severe mental impairments due to anxiety.  *Id.* at 663–73, 698–708.

12        On February 10, 2016, T.W. saw Dr. Amgott-Kwan "at [his] request for routine follow

13  up."  *Id.* at 736.  T.W. said "she didn't feel any need to contact [Dr. Amgott-Kwan] since 10/2014,

14  then [went] into listing of multiple symptoms in monotone voice without pauses," including

15  constant vertigo, migraines that lasted for days, and petit mal seizures that she at first

16  characterized as occurring "all the time" but later said she experienced "every few months."  *Id.*

17  Dr. Amgott-Kwan's report includes the following notes:

18              Mental status: Alert, speech fluent but monotone. Tangential
            historian. Mildly angry about having to wait, slightly confrontational
19           tone. Still harbors resentment about perceived past mistreatment in
            [Kaiser Permanente]. Mentions having to get lawyers involved
20           several times.

21              . . .

22              Benign neuro exam. Multiple somatic complaints. Inconsistent
            historian regarding frequency, duration, and intensity of vertigo,
23           migraines, and "petit mal"s. Mentions she needs documentation for
            disability (on SSI). I am not able to provide neurologic justification
24           for disability. No CNS cause for vertigo. Migraines and seizures are
            not clearly of sufficient frequency or intensity to justify neurologic
25           disability. She has not been consistent about following up with me.

26  *Id.* at 737.

27        The report from an April 15, 2016 postoperative examination with Dr. Lorraine Perry,

28  D.O., indicates that T.W. was upset about her diagnosis with endometriosis and not having been

3

offered treatment earlier, and includes the following note:

> *at the end of the visit the patients requests to video tape/record occurred at the end of the visit. [sic] I told her no, but I could have a manager present for the end of the conversation. We had finished taking by the time the manager was available. I wrote out all of the information for her. I also advised her to obtain a copy of her medical records. I told her that there was a note from Dr Wiese from 2009 that suggested she had endometriosis and states that she gave her literature at that time. The patient has no recollection of this discussion.

*Id.* at 986–87.

On October 17, 2016, T.W. spoke to a psychiatric social worker at the Permanente Medical Group ("Kaiser") in Oakland because she felt that "she needs someone to talk to" in order to prevent her from "go[ing] crazy." *Id.* at 1058. T.W. noted stress caused by her seizures, vertigo, and migraines, and that she isolated herself because she was unable to control her anger. *Id.* She reported experiencing sexual abuse as a child. *Id.* T.W. denied suicidal ideation at the time of this conversation, but reported that she had a history of suicide attempts and had experienced suicidal ideation the previous week, which she managed by isolating herself. *Id.* The social worker noted that T.W. "reports past trauma, intense emotional reactions, and lack of adequate coping," and referred her for the next available appointment with therapist intern Eric Burns, MFTi, on October 20, 2016. *Id.* at 1059.

MFTi Burns's notes from his initial assessment on that date document similar reports from T.W. *Id.* at 1064. T.W. also noted that she was "'stabbed' over the right ear in August of 2015," which she believed was the source of her vertigo. *Id.* T.W. stated that she felt better after their conversation. *Id.* They agreed to begin individual therapy on October 31, 2016. *Id.* MFTi Burns recorded a generally normal mental status examination, although he noted that T.W. was "tearful" and that her mood, while "euthymic," was also "sad." *Id.* at 1066–67. MFTi Burns diagnosed T.W. with: (1) adjustment disorder with depressive mood; and (2) intermittent explosive disorder. *Id.* at 1063. T.W. reported a wide variety of mental health symptoms, such as confusion, racing thoughts, anger, feeling that people plotted against her, memory problems, depression, and nightmares. *Id.* at 1082–83.

On December 9, 2016, T.W. reported the deaths of two people close to her, including a

4

nephew. *Id.* at 1090.  She declined MFTi Burns's recommendation for group therapy. *Id.*  MFTi Burns diagnosed: (1) adjustment disorder with mixed anxiety and depressed mood; and (2) intermittent explosive disorder. *Id.*  His mental status examination noted that T.W. was disheveled, fidgety, and distractable, with an "elevated" mood. *Id.* at 1091.

T.W. reported additional deaths in her family at a therapy session on December 23, 2016. *Id.* at 1099–1100.  Her mental status was normal. *Id.* at 1100.  MFTi Burns diagnosed adjustment disorder with depressed mood and epilepsy. *Id.* at 1099.

On January 23, 2017, T.W. told MFTi Burns that her brother had been arrested and was facing a sentence of life in prison, and that her landlord was attempting to evict her. *Id.* at 1109–10.  T.W.'s mental status was normal, and MFTi Burns noted the same diagnoses as before. *Id.* Notes from sessions on January 30, 2017 and February 10, 2017 again indicate a normal mental status examination and the same diagnoses. *Id.* at 1119–20, 1128–29.

On February 16, 2017, T.W. "came in to the session extremely agitated and upset" because she had come in two days earlier believing that her appointment was that day. *Id.* at 1137. Another of T.W.'s nephews had died, and she felt "off" that week and stated that she "really needed to talk" to MFTi Burns. *Id.* at 1138.  MFTi Burns noted a normal mental status except that T.W. was "irritable and angry," and he added "angry" to the list of diagnoses. *Id.* at 1137–38. T.W. circled the response indicating "nearly every day" for each mental health symptom on a questionnaire, including feeling depressed, feeling anxious, and having thoughts that she would be better off dead (although someone noted on the form next to that response, "no plan or intent"). *Id.* at 1145.

On March 24, 2017, T.W. reported stress about not having yet received the results of a CT scan, and continued conflict with her landlord. *Id.* at 1147–48.  MFTi Burns noted a normal mental status and diagnosed adjustment disorder with depressed mood. *Id.*  On a questionnaire, T.W. reported feeling depressed and anxious every day, and other symptoms less frequently. *Id.* at 1155.  Notes from sessions on April 3, June 26,  and July 5, 2017 are similar: normal mental status examinations; concerns about family, health, and housing; diagnoses of anger and adjustment disorder with depressed mood; and reports of various mental health symptoms, some nearly every

1   day and others less frequently.  *Id.* at 1157–66, 1177–85, 1187–93.  On August 3 and August 10,

2   2017, T.W. reported that her symptoms were worsening and that she was having frequent "mini-

3   seizures" that caused her to bite her tongue, but MFTi Burns's notes were otherwise similar.  *See*

4   *id.* at 1195–1209.  On August 18, 2017, T.W. "processed, at length, her agitation with her family"

5   and reported feeling depressed and anxious nearly every day; MFTi Burns again reported a normal

6   mental status and diagnosed epilepsy and adjustment disorder with depressed mood.  *Id.* at 1211–

7   19.

8        A note from February 2, 2018 states that T.W. contacted Kaiser hoping to return to

9   treatment, and that MFTi Burns was no longer with Kaiser.  *Id.* at 1221.

10        T.W. saw a new therapist, LCSW Matthew Torres, on March 8, 2018.  *Id.* at 1229.  T.W.

11   was concerned about her family's neglect of her elderly grandmother, prompting LCSW Torres to

12   file an Adult Protective Services report.  *Id.* at 1230.  T.W. stated that she was "in need to talk to

13   someone to process her stress and work on better managing her mood/anger."  *Id.*  LCSW Torres

14   listed T.W.'s symptoms as follows:

15        Anxiety: restlessness and feeling on edge, racing thoughts, easily
         fatigued, racing heart rate, light headed feeling, shortness of breath at
16        times, muscle tension, fear of losing control or going crazy from
         anxiety, sleep disturbance, isolating behaviors, intrusive thoughts and
17        flash backs from trauma hx, hypervigilance, nightmares (in the past),
         panic attacks, and reports [of disliking certain bodily functions,
18        potentially related to her history of abuse].

19        Depression: psychomotor retardation, fluctuating weight, depressed
         mood most of the day, anhedonia, insomnia, loss of energy, struggles
20        concentrating, crying often, low self-esteem.

21   *Id.*  T.W. reported feeling most of the symptoms on a mental health questionnaire nearly every

22   day.  *Id.* at 1239.  T.W. reported "that the onset of symptoms was around 2014 when her house

23   flooded."  *Id.* at 1230.  Many years earlier, T.W. made superficial cuts on her wrist and had been

24   treated in an inpatient facility for suicidal ideation.  *Id.*  LCSW Torres diagnosed generalized

25   anxiety disorder and depressive disorder, and noted a need to further assess for PTSD and a

26   history of manic symptoms.  *Id.* at 1229–30.  His mental status examination of T.W. noted

27   "normal and loud" speech and "anxious, irritable, angry and sad" mood, among other findings that

28   were generally normal.  *Id.* at 1233.

United States District Court
Northern District of California

1    At a therapy session on March 16, 2018, T.W. told LCSW Torres that she was worried her

2    grandmother was near death, and that many of her friends and family members had died.  *Id.* at

3    1241.  T.W. discussed a history of trauma including sexual abuse and witnessing her father

4    attempting to kill her mother.  *Id.*  T.W. wanted to "work on 'feeling bad about herself.'"  *Id.*

5    LCSW Torres diagnosed her with PTSD, and discussed the benefits of cognitive behavioral

6    therapy in treating PTSD.  *Id.*  T.W.'s mental status was normal except for "anxious and sad"

7    mood.  *Id.* at 1242.

8    On March 23, 2018, T.W. had difficulty staying a single topic:

9        [T.W.] reports that she continues to have various life stressors
         affecting her. Patient tends to move from topic to topic addressing
10       people who have caused her distress throughout the past week and
         shares the responses she has told them/would tell them. When I
11       referenced patient's previous stated goals for treatment she would talk
         about these goals for a moment then begin talking about the various
12       stressors (moving from one to the next) agiain [sic]. She reports that
         [her] sleep is still impaired and that she has been feeling anxious.
13       Patient stated that she often does extra for other people then feels
         taken advantage of.
14

15   *Id.* at 1249.  T.W. reported experiencing insomnia nearly every day and other symptoms less

16   frequently.  *Id.* at 1255.  LCSW Torres assessed normal mental status except for anxiety and rapid

17   speech, and diagnosed PTSD and "major depressive disorder, single episode, mild."  *Id.* at 1249–

18   50 (capitalization altered).  At a session on April 30, 2018, T.W. reported experiencing anxiety

19   nearly every day, and LCSW Torres assessed a normal mental status except for dysphoric and

20   anxious mood.  *Id.* at 1258, 1263.

21   At a therapy session on April 3, 2018, T.W. reported "experiencing severe anxiety" and

22   that she felt "tightness in her chest a choking sensation."  *Id.* at 1265.  LCSW Torres reported that

23   T.W. was "shaky in session" and "tearful," with "rapid speech."  *Id.*  He noted that she was

24   worried about health issues including seizures, as well as her family members' health problems

25   and violence and drug abuse in her neighborhood.  *Id.*  LCSW Torres reported a normal mental

26   status examination except that T.W.'s mood was "dysphoric, anxious, elevated and sad."  *Id.* at

27   1266.  LCSW Torres diagnosed T.W. with PTSD and major depressive disorder ("recurrent

28   episode, moderate").  *Id.* at 1265 (capitalization altered).

On April 12, 2018, T.W. reported that her grandmother died the day before and an aunt was in hospice care; LCSW Torres diagnosed major depressive disorder and bereavement, and recorded a normal mental status examination. *Id.* at 1273–74. Four days later on April 16, 2018, T.W. told LCSW Torres that her cousin and grandmother had both recently died, and she was "struggling right now in part due to the grief and loss but also due to the increased interaction with various family members that contribute to her anxiety and depression and often trigger her anger and other bothersome mental health symptoms." *Id.* at 1281. T.W. was confident she would experience a seizure due to stress. *Id.* LCSW Torres diagnosed her with generalized anxiety disorder and bereavement, and reported a normal mental status examination except "pressured and rambling" speech and "depressed, sad and tearful" mood. *Id.* at 1281–82. T.W. reported that she experienced all symptoms on a mental health questionnaire nearly every day, except for thoughts that she would be better off dead. *Id.* at 1287.

On April 27, 2018, T.W. reported the death of another family member, and that a new neighbor was bothering her. *Id.* at 1289. LCSW Torres interrupted her after she "began sharing, speaking rapidly, about people that frustrate her." *Id.* LCSW Torres diagnosed her with major depressive disorder and PTSD, and reported a normal mental status except "loud and rapid" speech and "angry" mood. *Id.* at 1290.

In a telephone appointment on May 18, 2018, T.W. told LCSW Torres that she had been in a car accident, was not feeling well, and had sleep impairments. *Id.* at 1297. She did not cry at the recent deaths of her relatives, explaining that "it takes my energy." *Id.* She "was able to identify immediate coping interventions" but struggled with longer-term goals. *Id.* LCSW Torres diagnosed generalized anxiety disorder, normal mental status, and a global assessment of functioning ("GAF") in the range of 51 to 60, indicating "moderate symptoms." *Id.* at 1297–98.

At another telephone appointment on June 7, 2018, T.W. reported pain, grief, and holding back her emotions. *Id.* at 1302. She stated "that she enjoys helping others with housing/rent," and that she felt "somewhat better but also somewhat the same from when she started treatment." *Id.* LCSW Torres reported a normal mental status and a higher GAF score indicating "mild symptoms," and diagnosed "major depressive disorder, recurrent episode, mild." *Id.* at 1302–03

8

1   (capitalization altered).

2       At a telephone appointment on June 12, 2018, T.W. reported that she was doing better and

3   had resolved an issue with her neighbor, although she "has not been processing her grief." *Id.* at

4   1307.  LCSW Torres noted that T.W. "may have some disorganized thinking" because she "at

5   times would have tangential commenting and unable to focus on one topic," but that she also "at

6   times appeared to have concrete thinking," and he would "continue to assess." *Id.* at 1307.  T.W.

7   "began to whisper [a] story" about an incident when she was eighteen years old and "did

8   something [she] didn't mean to," but "then shifted topics and began talking at normal volume."

9   *Id.*  LCSW Torres assessed a normal mental status except that T.W. was irritable, recorded a GAF

10  score indicating moderate symptoms, and diagnosed "major depressive disorder, single episode,

11  mild." *Id.* at 1307–08 (capitalization altered).  He concluded that he "may need to further assess

12  for mild thought disorder symptoms." *Id.* at 1308.

13      **B.    First Hearing**

14      ALJ E. Alis held a hearing on December 21, 2017. *Id.* at 61.  T.W.'s attorney noted that he

15  had not yet received certain psychiatric records from Kaiser, and certain records regarding

16  physical impairments had been submitted recently but not yet assigned exhibit numbers. *Id.* at 64–

17  65.  T.W.'s attorney also had not yet been given access to documents from T.W.'s previous claim

18  file, which the ALJ stated would be resolved. *Id.* at 65–66.

19      The ALJ observed that T.W. was clutching her stomach, and T.W. testified that she was in

20  pain due to menstruation and endometriosis. *Id.* at 67.  T.W. also stated that she had to close her

21  eyes because the lights were too bright, "like a trigger [of her] nerve" in relation to her epilepsy,

22  and the ALJ dimmed the lights to a lower level that was more manageable for her. *Id.* at 67–68.

23      T.W. testified that she last worked in 1999, and had tried to do volunteer work at a park

24  since then but was not able to do so because of her epilepsy and other medical conditions. *Id.* at

25  68–69.  She stated that she could not do any kind of work because she could not deal with other

26  people when she was in pain or uncomfortable due to her endometriosis, which occurred without

27  warning, and that she only had around four days per month without pain. *Id.* at 69.

28      T.W. testified that she continued to experience effects of her epilepsy, with doctors having

*United States District Court*
*Northern District of California*

9

told her recently that biting her tongue caused pain in her throat and ear. *Id.* at 70.  She was not sure how often she had seizures, because doctors had told her that some of the symptoms she thought were seizures were in fact caused by vertigo, even though the same symptoms had been diagnosed as epilepsy when she was younger. *Id.* at 70–71.  She described those symptoms as follows: "[B]ut it's like I'm sitting up here now, and everything will be spinning around.  The lights, it'd be too bright to where I can't take it.  I can't take like sound and stuff like that." *Id.* at 71–72.

Questioned by her attorney, T.W. testified that she last worked at a check-cashing business in 1999 when she was around twenty years old, where she had a seizure and was lying on the floor for around two minutes, after which the manager dropped her off at home. *Id.* at 72–73.  She confirmed that she still has seizures, including within the previous week, and that at the time of the hearing she had a hole on the inside of her mouth from biting it "over the past couple of days." *Id.* at 73.  T.W. testified that she still sometimes loses consciousness, has convulsions, and loses control of her bladder during seizures. *Id.* at 75–76.  Afterwards, she feels disoriented and confused to the point that she does not know who she is, and has mood swings that sometimes cause her to cry. *Id.* at 76.  The time it takes her to recover depends on the people who are around her. *Id.*  T.W. testified that her doctor had recently prescribed Zofran in addition to her ongoing use of Keppra and she didn't feel that it was helping, but not taking her medication made her "body feel down." *Id.* at 74–75.

Asked by her lawyer we she has not sought more medical treatment after her seizures, T.W. testified as follows:

> A   From the last time when I can remember or recall, it's because when I do have the full-blown seizures, and some don't understand what it is to have a seizure, or what it is to be done, but to wake up strapped to a bed, and someone's talking to you like you've done something wrong, I wake up, I'm strapped to the bed. My body -- my nerves feel the sense that something isn't right with you, because you don't trust me. But I might trust them over there, and I'm trying to talk to them, and if I kneel my forehead down on your hand, it's because I'm trying to get some energy so I can revive back into my body. I don't know how it is. Sometimes I just walk up to people, and I might just grab them and hug them, even if I don't know them.
>
> Q   Just to help you feel better.

A   Just to try to make me feel some sense until I get somebody else that's around.

Q   So, going to the hospital after a seizure, if somebody called an ambulance, would that make you feel better or worse?

A   Sometimes, as far as like they say when the ambulance used to come, they said that I'd be, no, get the police away from me, or I'd be trying to get away. And there's been a couple of times to where the ambulance people have almost just left me at home and said that they weren't going to take me, because I was ranting and raving, but my eyes are open, but I'm not here.

Q   Right.

A   I'm not here. That's even on Highland's record that I forgot who I was. For a month and a half, I didn't know who I was.

Q   So when you do have a seizure --

A   And when I do have seizures, and I go to the doctors, and the doctor always tells me, every time you have a seizure, you don't need to come into the emergency. So, I get confused on -- as far as one what to do. It's like no one is taking the time out with me.

*Id.* at 77–78.

T.W. testified that he her father lives near her and will come to her house to check on her if she has a seizure while talking on the phone with someone, which helps her feel better. *Id.* at 78–79. She stated that she can sometimes tell from a feeling like she is "shooting into the air, or . . . shooting down" that she is about to have seizure, and when she has that feeling she lies on the floor so the seizure will not cause damage. *Id.* at 79. To reduce her likelihood of seizing, T.W. avoids leaving the house and interacting with large numbers of people. *Id.* at 79–80. She testified that she only leaves the house around once a week, and only for appointments. *Id.* Sometimes when she is "stuck in that world as far as in [her] seizure or in the pain world," she feels like she "can't be bothered with no one." *Id.* at 80. Her mother accompanied her to the hearing because T.W. prefers not to leave the house alone, due to fear that she might forget where she is, and to avoid being "mixed up" with "all of the drug use and stuff" in Oakland. *Id.* at 81.

T.W. also confirmed that most of her recent treatment has been for endometriosis, which causes her unbearable pain that feels like her back is breaking. *Id.* at 76–77. She stated that her endometriosis was only diagnosed "within the last couple of years," and was not initially "as bad

11

as it is right now." *Id.* at 81. T.W. testified that symptoms of her endometriosis—including "bleeding on the inside" and "hemorrhaging"—sometimes resemble a miscarriage, and that she in fact had miscarriage even though doctors had told her that she could not become pregnant. *Id.* at 82–83. T.W. felt that the doctors "wait until the last minute until something is literally wrong," and that "[i]t seems like everyone is trying to take the blame off themselves and just trying to point the finger at [her]" when she's sought treatment. *Id.* at 82. T.W. testified that she was experiencing pain on the date of the hearing but it was not one of her worst days, and that if it was, she would not have been able to attend the hearing, although it was important to her to be there. *Id.* at 83–84.

Turning to her anxiety, T.W. explained her symptoms as follows:

> The nausea makes me feel like my body is tired; like my body is weak. It's basically like I have to pull myself as far as walk along with things. It's like holding onto a gate. I can't get up, but I have to pull with my arms up. That's the best I can do as far as pulling myself up on something.

*Id.* at 84. She experiences mood swings, and sometimes has difficulty talking with people. *Id.* at 84–85. She had been seeing Eric Burns weekly for mental health treatment, including to talk about issues with her endometriosis and seizures that she would not discuss with anyone else, but when he left Kaiser, she was not comfortable finding a new mental health provider or therapist. *Id.* at 86–88.

When T.W. is experiencing pain, she "cannot be around a lot of people" and would not be able to attend a regular commitment five days a week. *Id.* at 84–86. If she was not experiencing pain, she would be able to regularly attend commitments five days a week. *Id.* at 84–85.

In response to further questioning from the ALJ, T.W. testified that she loses control of her bladder at least monthly, and at most two or three times a week, and that she now regularly wears Depends diapers. *Id.* at 88. She stated that it occurs not only while she is asleep but also during the day, and is caused by her endometriosis. *Id.* at 89.

T.W. testified that she lives by herself but her parents visit regularly and her boyfriend visits daily. *Id.* at 89–90. In T.W.'s words, they help "to make sure that I'm back on track; letting me know that I'm still who I am, telling me my name and stuff." *Id.* at 90. She is able to do

12

household chores on her own but does not always remember to take her medication. *Id.* at 90. Sometime when she experiences fatigue and nausea, she will "just lay down and hop[e] that [she will] just get back up in time as far as taking it," and if she does not, she waits until the next day to take her next dose. *Id.* T.W. testifies that she has never used illegal drugs and has not drank alcohol for ten years. *Id.* at 90–91.

The ALJ questioned vocational expert ("VE") Susan Creighton-Clavel, beginning with the following hypothetical:

> [A]ssume a hypothetical individual of the Claimant's same age, education and with no past work. Further assume that for the first hypothetical that the individual can lift and/or carry 50 pounds occasionally, 25 pounds frequently. Can stand, walk or sit, each for eight hours out of an eight-hour workday. Can occasionally climb ramps and stairs. Cannot climb ladders, ropes or scaffolds. Cannot work at unprotected heights or around dangerous moving mechanical parts. Cannot operate a motor vehicle.

*Id.* at 92. VE Creighton-Clavel testified that such a person could work as an agricultural packer, childcare attendant, or as a janitor, except that half of available jobs as a janitor would be ruled out for requiring ladders. *Id.* at 93–93.

The ALJ's second hypothetical had the same restrictions as above, but with lifting, carrying, pushing, and pulling limited to twenty pounds occasionally and ten pounds frequently, and the following nonexertional limitations:

> She would be limited to simple and routine tasks and making simple, work-related decisions. She would need a job where she could work independently with few other individuals in the vicinity. So, something like during a graveyard shift in a commercial office building where there may be some building tenants present or some security present, but not many, because it's off-peak hours, and she would need a job where [there] would only be incidental interactions required in order to accomplish the work. So, for example, she can certainly knock on somebody's office door during a graveyard shift and say, excuse me, can I come in and take your trash. Something of that nature.

*Id.* at 93–94. VE Creighton-Clavel testified that such a person could work as a garment folder, rag sorter, or in half of the jobs available as a packing line worker. *Id.* at 94–95.

For both of those hypotheticals, VE Creighton-Clavel testified that employers would tolerate no more than fifteen percent of time off task, so long as that time was spread throughout

the workday in periods of two to three minutes off task for every fifteen minutes of work, with the employee remaining at their workstation.  *Id.* at 95–96.  If someone required a period of nine minutes off task all at once per hour, or had to leave their workstation for shorter breaks, VE Creighton-Clavel testified that they would not be employable.  *Id.* at 96.

In response to questioning from T.W.'s attorney, VE Creighton-Clavel testified that someone who met the second hypothetical but had three or more absences per month would not be employable, although the majority of employers would tolerate one absence per month.  *Id.*  VE Creighton-Clavel testified that employers would tolerate "running to the restroom for two to three minutes . . . a couple extra times a day," but would not tolerate longer bathroom breaks of five to ten or more minutes in unskilled jobs, or an employee lying down due to pain or seizures.  *Id.* at 96–97.  According to VE Creighton-Clavel, "a lot of employers" would tolerate an employee leaving fifteen minutes early on occasion, but they might not tolerate several-hour breaks for doctors' appointments, or leaving early with "no pre-arranged time."  *Id.* at 97.  VE Creighton-Clavel testified that someone who got into an argument with a supervisor would not be able to keep their job, and someone with moderate impairments in concentration, persistence, and pace, resulting in spending twenty percent of the day off task, would not be able to maintain the jobs that she had identified.  *Id.* at 97–98.

At the end of this hearing, the ALJ stated that the record would remain open to allow submission of the missing Kaiser mental health records.  *Id.* at 98.

### C.   Second Hearing

The ALJ held a supplemental hearing on July 10, 2018.  AR at 33–35.  The ALJ stated that the supplemental hearing was at T.W.'s attorney's request, but T.W.'s attorney clarified that he only requested a supplemental hearing to take medical expert testimony, and had not asked for a second hearing with only T.W. and a VE testifying again.  *Id.* at 35–38.  The ALJ stated that medical expert testimony was not necessary, and offered to end the hearing if T.W.'s attorney did not want to question T.W. further, but T.W.'s attorney responded that they should go forward and take her testimony since the hearing had already been convened, and T.W. was "upset with the process and probably ha[d] some things to say."  *Id.* at 38.

14

In response to brief questioning by the ALJ, T.W. confirmed that she had not had a job or done volunteer work since the previous hearing. *Id.* at 40. She stated that her pain from endometriosis was beyond her control and would come and go, like her epilepsy, and that she was seeing a counselor and Dr. Frank Dustin for neurology at Kaiser. *Id.* at 39–40.

In response to questioning by her attorney, T.W. testified that she now stayed at home more than she did at the time of the previous hearing due to her anxiety, inability to be around large numbers of people, and increasing drug use by other people in her neighborhood. *Id.* at 40–41. She stated that she had petit mal seizures once or twice a week, sometimes triggered by stress or pressure to do things for other people. *Id.* at 41–42. T.W. testified that she would not be able to do the sort of volunteer work she had done at a park years earlier because of the pain caused by her endometriosis. *Id.* at 42–43. As at the previous hearing, T.W. testified that she only had four days per month without pain. *Id.* at 43.

T.W. stated that she might or might not have problems with taking instructions at a workplace. *Id.* at 43–44. She testified that she responds to conflict by walking away and taking time to think, as she has been told to do by her therapist, and that before the hearing, she had gotten upset in a conversation with her lawyer and walked out of the room. *Id.* at 44. She said that she would not, however, react that way at a job, and testified somewhat equivocally about whether she would be able to perform her past work at a check cashing business:

> Q   Okay. And do you think that if you tried to go to work somewhere that you might walk out like that?
>
> A   No. Because it would be a job, and I wouldn't take that job on as far as to put the job at risk because it's a business, and if I know that I can't do something, it's like standing at a cash register and I'm dealing with all of these people in a line.
>
> Q   Yeah.
>
> A   I don't want them to get mad at me, and I know I couldn't do this job, and I've already told them.
>
> Q   But you think you could do that job?
>
> A   Yeah. I've done check cashing. Yes, I've done check cashing. I worked at H Check Cashing [phonetic] for --
>
> Q   Okay. Why don't you think you could do it now?

15

1    A   Because that's the last time I had a job.

2    Q   Okay. And why did it --

3    A   And I fell out up in there, because I had a seizure, and the manager
     was still standing there.

4

5    *Id.* at 44–45 (brackets in original).

6         T.W. stated that her ability to work should not be evaluated based only on her anxiety or

7    epilepsy, but also required taking into account her "endometriosis, vertigo, and [her] brain." *Id.* at

8    45.  She said that she thought she could make it through a day of work at a check cashing business

9    if she did not "have any seizures and no pain or anything," and that whether she could get through

10   a week would depend "on how [her] body reacts." *Id.* at 46.  She noted that her medication has

11   side effects, and that she experienced mood swings that caused her to "come back like a baby like

12   [she is] in kid mode," or to "be aggressive when [she] come[s] back," but when her lawyer asked

13   if it was hard for her to control her mood swings, she responded, "Really, no." *Id.* at 46–47.

14        T.W.'s attorney asked how many days of work at a check cashing business T.W. would

15   expect to miss per month due to her health.  *Id.* at 47.  T.W. responded that the pain she

16   experienced was "indescribable," and even though at that moment she was not experiencing pain,

17   it could begin suddenly and she would need to lie on the floor to be as comfortable as possible.  *Id.*

18   She said that her attorney should ask her doctors how many days of work she would need to miss,

19   and she could not guess the number.  *Id.* at 47–48.  When her attorney pressed the issue, T.W.

20   stated that the stress of the conversation was "making [her] nerve go up" and would cause her to

21   have a petit mal seizure. *Id.* at 48.  The exchange veered off topic:

22        Q   Right.  I'm not trying to do that.

23        A   I don't understand what you're saying. If I don't understand, I
          can't answer correctly.
24
          Q   I'm not --
25
          A   Is this being recorded?
26
          Q   Yeah. Of course.
27
          A   I would like for it to be recorded. I don't understand. I just --
28        someone got back into contact with my cellphone who I am someone.

16

1    I still don't know who I am, and I'm still trying to figure out
     everything of that's going on. I'm still taking steps with Kaiser to
2    figure out what we're going to do with my body parts as far as how
     we can rid of this pain and remove some things.

3    Q  I'm not trying to upset you.

4    A  I don't understand. I don't know.

5    Q  I'm not trying to upset you.

6    A  I don't know.

7    ALJ:  Ms. [T.W.], do you need to take a break?

8    CLMT:  I don't need to take a break. I'm ok.

9  *Id.* at 49.

10         Returning to the number of days per month she would miss from work, T.W. testified she

11  only had four days per month without pain, and her attorney should "do the math" on how many

12  days she would need to miss from work.  *Id.*  She said that it would be different if she was

13  working somewhere "behind closed walls" where the public would not see her in pain, and she

14  would "probably be able to still move some paper being in pain and stuff," but if it got "to that bad

15  extreme, [she] would lay on the floor."  *Id.* at 50.

16         T.W.'s attorney asked her if during a typical day at home, she ever needed to "take a

17  break" due to pain or stress.  *Id.*  T.W. responded:

18             A  I don't take a break. There is no breaks. With the laws and
               everything going on right, and the economy, there are no breaks at all.
19             When I have pain, one minute you might look at me how I look dry
               right now; you might turn around again and look at me, and it'll look
20             like somebody threw a bucket of water on me, because it's pressure
               points in my body that can't take that pain.
21
               Q  Um-hum.
22
               A  To where I feel like I'm uncomfortable, and I'm in pain at the
23             same time. They say take Motrin. I don't know how often I can keep
               taking the Motrin before something does open. They gave me Norcos
24             to take at the doctor, at the OB/GYN. I quit taking them because
               people told me, it'll make you constipated, and that's a drug.
25

26  *Id.*

27         T.W. testified that she has not found a medication that controls her pain, and her seizure

28  medication does not prevent her from experiencing petit mal seizures once or twice a week.  *Id.* at

51.  Her tongue felt "twisted" when she woke up the morning of the hearing because she had bitten it during a seizure the day before.  *Id.* at 52.

        In response to questions from the ALJ, T.W. testified that she went a period of months without seeing a therapist because MFTi Burns had told her that he was only taking a month and a half leave from Kaiser, but when MFTi Burns didn't return, she eventually began seeing CNS Matt Turner[3] for counseling.  *Id.* at 53–54.  T.W. testified that she was not taking medication for her mental health and CNS Turner had not recommended that she do so.  *Id.* at 54–55.  T.W. was not attending group therapy because she needed one-on-one therapy.  *Id.* at 55.

        There was some confusion as to whether there was any need to question the vocational expert who appeared at this hearing, VE Timothy Farrell:

> ALJ:  Okay. Thank you. I have no questions for the vocational expert. Do you have anything you'd like to ask him?
>
> ATTY:  We took VE testimony last time.
>
> ALJ:  Right.
>
> CLMT:  It's a different person on the phone.
>
> ATTY:  Yeah. I mean we can go through the same --
>
> CLMT:  I cannot quit biting on my tongue.
>
> ATTY:  What's that?
>
> CLMT:  I cannot quit biting up on my tongue. It would make me stop biting on my tongue, because it's purple and stuff, and it feels like razor cuts.
>
> ATTY:  You want me to ask him that?
>
> CLMT:  Yeah. Yeah. The man on the phone.
>
> ATTY:  He's a vocational expert.
>
> CLMT:  Oh. I don't understand.
>
> ATTY:  He's not a doctor. He's --
>
> ALJ:  He's only there should we need him for job information.

---

[3] The record includes notes from treatment with LCSW Matthew Torres, but no "Matt Turner."  It seems likely that the reference to "Matt Turner" is an error, although it is not clear if the error was by T.W. or in transcription.

1    CLMT:  Oh, okay.

2    ATTY:  Yeah. I mean, I reviewed it this morning, and I, you know --
     I can certainly ask him a few questions.
3
     ALJ:  Okay.
4
     ATTY:  I'm not quite sure why he's here, but I'll ask them anyway.
5

6    *Id.* at 55–56.

7          In response to questioning by T.W.'s attorney, VE Farrell testified that a number of jobs

8    would be available for "a younger individual with a 12th grade education and no past relevant

9    work who is limited to light exertion," with no other restrictions. *Id.* at 57.  With an additional

10   limitation of three or more absences per month, VE Farrell testified that no jobs would be

11   available because most employers would not tolerate more than one absence per month. *Id.* at 57–

12   58.  If instead of absences, the person in the first hypothetical required "frequent, unplanned

13   breaks," VE Farrell again testified that no jobs would be available because "in general employers

14   will not tolerate unscheduled rest breaks in excess of what is mandated by law, particularly at the

15   unskilled level." *Id.* at 58.  If instead of absences or rest breaks, the person in the first hypothetical

16   had "moderate impairment in maintaining concentration, persistence and pace," taking them off

17   task up to twenty percent of the workday, VE Farrell again testified that no jobs would be

18   available. *Id.*  Finally, if the person in the first hypothetical had "moderate impairment in

19   maintaining appropriate communication with supervisors, coworkers and the public," meaning

20   that they were unable to maintain appropriate communication (and "potentially having arguments

21   and walking away") for up to twenty percent of the workday, VE Farrell once again testified that

22   no jobs would be available. *Id.* at 58–59.

23         **D.    Legal Background for Determination that Disability Has Ended**

24               **1.    Eight-Step Framework for ALJ Decisions**

25         In considering whether disability has ended for a claimant previously found to be disabled,

26   an ALJ applies an eight-step regulatory framework.[4]  *See generally* 20 C.F.R. §§ 404.1594,

27

28   _____

     [4] The process for a Title II claim uses the eight-step framework set forth here, while the process
     for a Title XVI claim uses a seven-step process that is materially identical except for omitting the

United States District Court
Northern District of California

416.994.

First, if the claimant is engaging in substantial gainful activity, the claimant is no longer disabled.

Second, if the claimant's impairments meet or medically equal the severity of one of the impairments defined in the Social Security Administration's listings, *see* 20 C.F.R. § 404, subpt. P, app. 1, the claimant is still disabled.

Third, if the claimant's medical condition has improved, the analysis continues at step four, while if no improvement has occurred, the analysis skips to step five.

At step four, the ALJ considers whether the claimant's medical improvement is related to their ability to work. If so, the analysis skips to step six; if not, it continues to step five.

At step five, the ALJ considers whether any of several enumerated exceptions to medical improvement apply. Some exceptions require proceeding to step six, while others warrant a finding that disability has ended. If no exception applies, the claimant is still disabled.

At step six, the ALJ considers whether the claimant's current impairments in combination are "severe." If the impairments do not limit the claimant's ability to perform basic work activities, the claimant is no longer disabled, while if they do, the analysis continues to step seven.

At step seven, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant can perform their past work. If so, the claimant is no longer disabled. If not, the analysis continues to step eight.

At the eighth and final step, the ALJ determines whether there is other work available that the claimant can perform. If so, the claimant is no longer disabled. If not, they are still disabled.

### 2.      Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the general disability evaluation process with regulations governing the evaluation of mental impairments in comparison to the listing of impairments. *See generally* 20 C.F.R. § 404.1520a; *see also Segura v. Berryhill*, CV 17-07303-RAO, 2018 WL 5255317, at *12 (C.D. Cal. Oct. 19, 2018) (citing *Maier v. Comm'r of Soc.*

---

first step addressing substantial gainful activity. Because there is no dispute here regarding that factor, this order uses the Title II framework for simplicity.

1    *Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must determine whether the

2    claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next,

3    the Commissioner must assess the degree of functional limitation resulting from the claimant's

4    mental impairment with respect to four broad functional areas: (1) ability to understand,

5    remember, or apply information; (2) ability to interact with others; (3) ability to concentrate,

6    persist, or maintain pace; and (4) ability to adapt or manage oneself.  20 C.F.R. § 404.1529a(b)(2),

7    (c).  Finally, the Commissioner must determine the severity of the claimant's mental impairment

8    and whether that severity meets or equals the severity of a mental impairment listed in Appendix

9    1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's

10   mental impairments meets or equals the severity of a listed mental impairment, the claimant is

11   disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to further steps

12   of the analytical process detailed above.  *See* 20 C.F.R. § 404.1520a(d)(3).

13          Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

14   presence of various listed mental impairments, but all listed mental impairments share certain

15   "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

16   criteria).  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically

17   determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

18   listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

19   general Paragraph B criteria.  To satisfy the Paragraph B criteria, one's mental disorder must result

20   in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental

21   functioning.  *See id.*  A "marked" limitation is one that is "more than moderate but less than

22   extreme" and "may arise when several activities or functions are impaired, or even when only one

23   is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's]

24   ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.* at

25   12.00C.

26          This evaluation process is part of the determination of whether an impairment meets a

27   listing, and is not the same as assessing a claimant's RFC.  Social Security Ruling ("SSR") 96-8p,

28   1996 WL 374184, at *4 (July 2, 1996).  If the Commissioner determines that the claimant has one

United States District Court
Northern District of California

1    or more severe mental impairments that neither meet nor are equal to any listing, the

2    Commissioner must assess the claimant's residual functional capacity at later steps, with a more

3    detailed assessment of the functional effects of the claimants' impairments.  20 C.F.R.

4    § 404.1520a(d)(3); SSR 96-8p, 1996 WL 374184 at *4.[5]

5        **E.    The ALJ's Decision**

6            The ALJ issued a decision on September 6, 2018 finding that T.W.'s disability ended on

7    April 17, 2015 and that she had not become disabled again since that date.  AR at 15–26.  The ALJ

8    identified a decision on March 15, 2010, which found T.W. disabled based on epilepsy meeting

9    the requirements of the applicable listing, as the relevant comparison point to determine whether

10   she was still disabled.  *Id.* at 17.  The only evidence ALJ cited for that prior determination was a

11   hearing officer's March 7, 2016 decision that disability had ended in April of 2015; the ALJ cited

12   no evidence from the initial determination of disability, and no such evidence appears to be

13   included in the administrative record.  *See id.* (citing AR at 145)

14           The ALJ first determined that T.W. was not engaged in substantial gainful activity.  *Id.*

15           Second, the ALJ determined that T.W.'s medically determinable impairments were

16   epilepsy, headaches, vertigo, and endometriosis, but that since April 17, 2015, her impairments

17   had not met or equaled the severity of any listed impairment.  *Id.*  The ALJ based that

18   determination on his conclusion that T.W.'s epilepsy had improved to the point that it no longer

19   met listing 11.02, and that the record did not show that T.W.'s impairments met or equaled any

20   other listing.  *Id.*

21           As part of the analysis of whether T.W.'s impairments met or equaled a listing, the ALJ

22   determined that T.W. had only minimal mental limitations that did not amount to a severe

23

24   ───────────────

25   [5] SSRs, according to the governing regulations, "are binding on all components of the Social
     Security Administration" and "represent precedent[ial] final opinions and orders and statements of
     policy and interpretations" of the Social Security Administration ("SSA").  20 C.F.R.
26   § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of
     SSRs).  "SSRs reflect the official interpretation of the SSA and are entitled to 'some deference as
27   long as they are consistent with the Social Security Act and regulations.'"  *Avenetti v. Barnhart*,
     456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th
     Cir. 2005)).  SSRs do not carry the "force of law," but they are binding on the ALJs nonetheless.
28   *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

impairment.  *Id.* at 18.  Addressing the Paragraph B criteria, the ALJ determined that T.W. had no

limitations in understanding, remembering, or applying information or in concentrating, persisting,

or maintaining pace, and only mild limitations in interacting with others and adapting or managing

herself.  *Id.*  The ALJ relied on T.W.'s description of her daily activities in her 2015 function

report, and afforded great weight to Dr. Kollath's psychological evaluation and report.  *Id.* at 18–

19.  The ALJ afforded "partial weight" to the non-examining state agency psychological

consultants, who applied an older version of the Paragraph B criteria, but assessed no more than

mild difficulties in any category.  *Id.* at 19.  The ALJ's only reference to T.W.'s more recent

treatment at Kaiser was to note that her mental status examinations were "mostly normal,"

including with respect to concentration.  *Id.* at 18–19.

The ALJ determined that T.W.'s medical condition had improved since the determination

of disability because her seizures had become less frequent, such that the severity of her epilepsy

no longer met listing 11.02, and that the improvement was related to her ability to work.  *Id.* at 19.

The ALJ determined that T.W. continued to have severe impairments because her

"epilepsy, headaches, vertigo, and endometriosis cause more than minimal limitation in [her]

ability to perform basic work activities."  *Id.*  The ALJ did not identify any mental impairment as

relevant to T.W.'s severe impairments.  *See id.*

The ALJ assessed the following RFC:

> Since April 17, 2015, based on the current impairments, the claimant
> has had the residual functional capacity to perform less than the full
> range of medium work as defined in 20 CFR 404.1567(c) and
> 416.967(c). Specifically, the claimant can stand and/or walk for 8
> hours in an 8-hour workday; can sit for 8 hours in an 8-hour workday;
> can occasionally climb ramps and stairs; should never climb ladders,
> ropes or scaffolds; should never work around unprotected heights or
> dangerous moving mechanical parts; and should never operate a
> motor vehicle.

*Id.* at 20.

After recounting T.W.'s symptom testimony, the ALJ concluded that her "current

medically determinable impairments could reasonably be expected to product the alleged

symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely consistent with the objective medical and other evidence for the

United States District Court
Northern District of California

1    reasons explained in [the ALJ's] decision." *Id.* at 20–21.  The ALJ therefore accepted T.W.'s

2    testimony as relevant to her RFC "only to the extent [it] can reasonably be accepted as consistent

3    with the objective medical evidence and other evidence." *Id.* at 21.[6]

4          The ALJ rejected T.W.'s testimony regarding the nature and frequency of her seizures

5    because she reported in 2014 that a petit mal seizure was her first in two years, because records

6    from 2015 emergency treatment noted that T.W. had not had a grand mal seizure in two years and

7    "had a history of noncompliance" (although she "had possibly been having petite mal seizures

8    daily"), and because at a February 2016 visit with Dr. Amgott-Kwan, T.W. first reported

9    migraines and petit mal seizures "all the time" but later said she only experienced them every few

10   months, Dr. Amgott-Kwan reported a benign neurological examination and that T.W. "was an

11   inconsistent historian," and Dr. Amgott-Kwan refused to "provide a neurological justification for

12   disability" because T.W.'s "migraines and seizures were not clearly of sufficient frequency or

13   intensity to justify neurologic disability, and she had not been consistent with follow-up." *Id.* at

14   21–22.  The ALJ also relied on a note from T.W.'s April 2016 pre-operative visit for laparoscopy

15   for her endometriosis indicating that her seizures were well controlled with medication. *Id.* at 22

16   (citing AR at 869).

17         The ALJ rejected T.W.'s testimony regarding vertigo because although she "reported

18   having vertigo 'all the time,'" Dr. Amgott-Kwan characterized her as an inconsistent historian and

19   found no neurological basis for her vertigo. *Id.*  The ALJ acknowledged a February 2016

20   emergency department visit for vertigo, after which T.W. returned later the same day because her

21   condition had not improved, but noted that test results were largely normal and that T.W.

22   eventually felt "much improved" after receiving IV fluids and Ativan. *Id.* at 22–23.  The ALJ

23

24   ─────────────────────
     [6] Although T.W. has not specifically raised the ALJ's treatment of her testimony as a basis for
25   reversal, the Court has serious doubts as to whether the ALJ's framing of the issue—whether the
     testimony is "entirely consistent with the objective medical and other evidence," AR at 21, and
26   whether "the objective medical evidence . . . warrant[s] any additional limitations," *id.* at 24—is
     consistent with the controlling legal standard: that if objective evidence shows impairments that
27   could be expected to cause the type of subjective symptoms at issue and the ALJ does not
     affirmatively find that the claimant is malingering, a claimant's testimony regarding the severity of
28   those symptoms must be credited absent compelling reasons to the contrary, and the claimant need
     not support such testimony with objective evidence. *See, e.g.*, *Vasquez v. Astrue*, 572 F.3d 586,
     591 (9th Cir. 2009).

1    noted that T.W. reported at a February 2017 consultative neurological evaluation "that she gets an

2    episode of vertigo every few months and, that when it happens, she feels that everything around

3    her is spinning," but did not explain whether that weighed in favor of or against crediting her

4    symptom testimony.  *Id.* at 23.

5         The ALJ rejected T.W.'s testimony regarding pain from her endometriosis because

6    although the endometriosis was medically documented, her pain required surgery laparoscopic

7    surgery in 2016 "which included ablation of endometriosis," and she was advised that the pain

8    would likely return without hormone suppression, T.W. at times declined therapy options, and

9    "the records document intermittent complaints of pain from endometriosis and do not indicate that

10   [T.W.] followed up with any of the recommended therapies for her pelvic pain, which suggests

11   that her pain or discomfort has not been as severe as alleged."  *Id.*

12        The ALJ gave great weight to Dr. Farah Rana's February 2017 consultative neurological

13   evaluation documenting largely normal test results, diagnosing likely "stress/tension type

14   headaches, and vertigo, most probably secondary to an inner vestibular disorder," and assessing no

15   restrictions except moderate weight restrictions and seizure precautions related to heights and

16   dangerous equipment.  *Id.* at 23–24.  The ALJ also gave great weight to the similar opinions of

17   non-examining state agency medical consultants in 2015.  *Id.* at 24.

18        The ALJ concluded that "the objective medical evidence does not warrant any additional

19   limitations beyond those established in the [ALJ's RFC assessment]."  *Id.*

20        Turning to the effect of that RFC, the ALJ determined that T.W. had no past relevant work,

21   but based on VE Creighton-Clavel's testimony at the first administrative hearing, there were jobs

22   T.W. could perform as an agricultural packer, child care attendant, or janitor.  *Id.* at 24–25.  The

23   ALJ therefore determined that T.W.'s disability ended on April 17, 2015, and that she had not

24   become disabled again since that date.  *Id.* at 25–26.

25        **F.   Issues Presented**

26        T.W.'s motion presents the following arguments for reversal: (1) the record lacks evidence

27   of a comparison point from which to assess medical improvement, Pl.'s Mot. (dkt. 18) at 8–9; (2)

28   the ALJ erred in finding T.W.'s psychiatric disorders non-severe, because the ALJ failed to

United States District Court
Northern District of California

1    address several psychiatric diagnoses and T.W.'s ongoing mental health treatment records, *id.* at

2    9–11; (3) the ALJ erred in crediting non-treating doctors' opinions over those of T.W.'s treating

3    clinicians, which the ALJ ignored, for both physical conditions and mental health, *id.* at 11–14;

4    (4) the ALJ's RFC assessment was not supported by substantial evidence, based on the purported

5    errors above, *id.* at 14; (5) the VE's testimony on which the ALJ relied was based on an

6    incomplete hypothetical, due to the purported errors above, *id.* at 15; and (6) the ALJ was

7    improperly appointed, based on the Supreme Court's holding in *Lucia v. SEC*, 138 S. Ct. 2044

8    (2018), Pl.'s Mot. at 15–16.  T.W. requests remand for further administrative proceedings before a

9    different ALJ.  *Id.* at 16–17.

10    The Commissioner disputes each of T.W.'s arguments, and argues that T.W. waived any

11    claim to disability based on mental impairment and her challenge to the ALJ's appointment by

12    failing to present those issues during administrative proceedings.  *See generally* Comm'r's Mot.

13    (dkt. 30).

## III.   ANALYSIS

### A.   Legal Standard

16    District courts have jurisdiction to review the final decisions of the Commissioner and may

17    affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

18    hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

19    When reviewing the Commissioner's decision, the Court takes as conclusive any findings

20    of the Commissioner that are free of legal error and supported by "substantial evidence."

21    Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

22    conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401

23    (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a

24    preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

25    1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial

26    evidence, the decision should be set aside if proper legal standards were not applied when

27    weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v.*

28    *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

United States District Court
Northern District of California

26

1    both the evidence that supports and the evidence that detracts from the Commissioner's

2    conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

3    F.2d 993, 995 (9th Cir. 1985)).

4           If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

5    the Court may remand for further proceedings or for a calculation of benefits.  *See Garrison v.*

6    *Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).  Here, T.W. seeks only remand for further

7    proceedings; she has not argued that the case should be remanded with instructions to award

8    benefits.  *See* Pl.'s Mot. at 17; Reply (dkt. 33) at 8.

9           **B.     The Record Lacks Evidence of a Comparison Point**

10          As the ALJ acknowledged, the determination that T.W. experienced medical improvement

11   required identifying a comparison point for her medical condition at the time she was previously

12   found to be disabled.  AR at 17.  The ALJ asserted that T.W. was disabled based on epilepsy of a

13   severity sufficient to meet listing 11.02.  *Id.*

14          The parties agree that there is no evidence in the administrative record from T.W.'s

15   original determination of disability or the most recent determination in 2010 that her disability

16   continued as of that time.  *See* Pl.'s Statement of the AR (dkt. 21) ¶ 4; Comm'r's Statement of the

17   AR (dkt. 30-1) ¶ 4.  The Commissioner's brief treats the ALJ's explanation of those decision as

18   sufficient in itself.  Comm'r's Mot. at 4–6.

19           The ALJ cited only the March 2016 decision of a hearing officer, who in turn cited no

20   evidence for their assertion that T.W. "was initially found to be disabled in a decision dated

21   04/23/2003 and last continued in 03/15/2010 with onset established as of 05/01/2000 on the basis

22   that the severity of the claimant's impairments met the criteria for listing 11.00."  AR at 17, 145.

23   A March 4, 2015 case analysis signed by Dr. J. Bradus, M.D., summarizes a comparison point

24   decision in which an ALJ found T.W. disabled based on seizures, but does not explain the

25   materials on which Dr. Bradus relied in creating that summary, and does not specifically state that

26   the prior determination was based on T.W.'s seizures meeting listing 11.02.  *See* AR at 653–57.

27          Because the ALJ identified no evidence in the record to support that T.W.'s previous

28   disability determination was based on her meeting listing 11.02—other than a hearing officer's

*United States District Court*
*Northern District of California*

27

1   decision, which the ALJ was tasked with reviewing de novo—the ALJ's determination was not

2   based on substantial evidence.  The ALJ's assessment of medical improvement necessarily relies

3   not only on T.W.'s current condition, but also on her condition at the comparison point of her

4   previous disability determination, and there does not appear to be any evidence in the record of

5   that earlier condition.[7]

6          It is not clear whether T.W. actually disputes that her previous finding of disability was

7   based on meeting listing 11.02.  Since she does not challenge the ALJ's conclusion that she does

8   not currently meet that listing, evidence to show that the previous determination was based on the

9   listing might be sufficient to resolve this deficiency and support a finding of medical

10  improvement, even without medical records underlying the earlier decision.  If there were no other

11  basis for remand, the Court would consider whether the Commissioner's failure to include the

12  earlier decision in the record might be harmless error in the absence of a clearer argument from

13  T.W. that she actually disputes the ALJ's explanation of the reason for her previous disability

14  determination.  But since other errors discussed below also require remand, the Court does not

15  reach that question, and the Commissioner is instructed on remand to supplement the record with

16  at least documents sufficient to show the stated grounds for T.W.'s initial disability determination,

17  if not also the medical records on which that decision was based.

18         **C.    T.W. Sufficiently Asserted Disability Based on Mental Impairments**

19         The Commissioner argues that T.W. waived any claim to disability based on mental

20  impairments by failing to raise that issue during administrative proceedings.  Comm'r's Mot. at 6–

21  7.  The Commissioner relies on T.W.'s November 2014 "continuing disability review report," AR

22  at 324, another undated continuing disability review report, *id.* at 339, and her February 2015

23  function report, *id.* at 347, none of which list mental impairments as a basis for her disability, as

24  framing the scope of her administrative claim.  *See* Comm'r's Mot. at 6; Comm'r's Statement of

25  Record (dkt. 30-1) ¶ 114.  The Commissioner cites an unpublished and non-precedential decision

26

27  _____

28  [7] As a hypothetical example, if the ALJ or other officer who previously found T.W. disabled had
    determined that she only experienced occasional petit mal seizures but those seizures nevertheless
    prevented her from working, the current record likely would not show medical improvement.

1    by the Ninth Circuit affirming a denial of benefits where the claimant "'did not assert before the

2    agency that he was disabled based on a mental impairment.'"  Commr's' Mot. at 7 (quoting

3    *Spence v. Colvin*, 617 F. App'x 752, 753 (9th Cir. 2015)).

4           Here, although T.W. did not list mental impairments in the forms cited by the

5    Commissioner, she repeatedly asserted the relevance of her mental impairments at other points in

6    the administrative process—perhaps most clearly in a March 9, 2018 letter from her attorney to the

7    ALJ citing her treatment for anxiety, depression, an adjustment disorder, and arguing that even if

8    T.W.'s epilepsy had improved, "the combination of the limitations resulting from her mental and

9    physical impairments should be found to preclude her from being able to perform substantial

10   gainful activity."  AR at 392.  Thus, unlike in the *Spence*, T.W. "claim[ed] a mental impairment

11   before the ALJ."  *Cf. Spence*, 617 F. App'x at 754.  The Commissioner cites no authority

12   suggesting that raising an issue outside of the specific forms on which the Commissioner relies is

13   insufficient.

14          Moreover, the Commissioner acknowledged that T.W.'s impairments were at issue

15   throughout the administrative process.  For example, a "Cessation or Continuance of Disability or

16   Blindness Determination and Transmittal" signed by Dr. Bradus on March 4, 2015 and by a

17   disability examiner on April 15, 2015 listed "anxiety disorders" as a secondary diagnosis, AR at

18   100–01, the Department of Social Services requested Dr. Kollath's "Complete Psychological

19   Evaluation" in 2015 for the purpose of determining T.W.'s disability status, *id.* at 658, and the

20   ALJ's ultimate decision explicitly considered the Paragraph B criteria, Dr. Kollath's report, and

21   the opinions of state agency non-examining psychological consultants to determine whether T.W.

22   met any listing for a mental impairment, *id.* at 18–19.

23          Because T.W. asserted disability based on mental impairments during the administrative

24   process, she has not waived any arguments related to the ALJ's consideration of such

25   impairments.

26          **D.    The ALJ Disregarded Evidence of Mental Impairments**

27          T.W.'s arguments regarding the ALJ's treatment of medical evidence in the record focus

28   on the ALJ's failure to discuss T.W.'s mental health treatment at Kaiser, which began in 2016.

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1    T.W. contends that the ALJ erred in not identifying her psychiatric disorders as severe

2    impairments, Pls.' Mot. at 9–11, that the ALJ effectively and impermissibly rejected her

3    therapists' opinions by failing to address them, *id.* at 13–14, that the ALJ's RFC assessment was

4    not supported by substantial evidence because it failed to account for mental health symptoms

5    identified by her Kaiser clinicians, *id.* at 14, and that the hypothetical the ALJ presented to the VE

6    failed to account for T.W.'s psychiatric impairments, *id.* at 15.[8]

7         T.W. characterizes this argument primarily as a failure to credit "opinions" from treating

8    providers, arguing that while MFTi Burns and LCSW Torres were not entitled to deference as

9    doctors or similar "acceptable medical sources," the ALJ was nevertheless required to provide

10   "germane" reasons for rejecting their opinions, and failed to do so.  *See* Reply at 5 (citing *Popa v.*

11   *Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017).  As the Commissioner correctly notes, however,

12   T.W. has not identified any *opinion* by any clinician that the ALJ failed to credit.  *See* Comm'r's

13   Mot. at 10–11.  MFTi Burns and LCSW Torres observed symptoms at specific visits and

14   (somewhat intermittently) diagnosed certain psychiatric disorders, but neither of them provided an

15   opinion as to T.W.'s ongoing limitations.  With the possible exception of occasional references to

16   GAF scores—which are of some but limited relevance to disability determinations, *see Garrison*,

17   759 F.3d at 1002 n.4—it is difficult to identify instances where either clinician expressed

18   "*judgments* about the nature and severity of [T.W.'s] impairment(s), including [her] symptoms,

19   diagnosis and prognosis," beyond mere diagnoses.  *See* 20 C.F.R. § 416.927(a)(1) (defining

20   "Medical opinions"); *see also id.* § 416.927(f) (addressing "Opinions from medical sources who

21   are not acceptable medical sources").  The Court cannot say whether the ALJ rejected the

22   diagnoses, because in the absence opinions regarding the severity of symptoms that would result

23   from them, the diagnoses alone are not necessarily incompatible with the ALJ's assessment of

24   T.W.'s limitations and RFC.

25   _____

26   [8] T.W. also briefly argues in her motion that the ALJ failed to account for treatment of her
     physical and neurological impairments at Kaiser, but does not address that issue in her reply
27   beyond conclusory references to "physical health clinicians" in arguments otherwise focused on
     her mental health treatment.  *See* Pls.' Mot. at 12–13, 14; *see generally* Reply.  Because the ALJ's
28   failure to address mental health treatment records warrants remand, the Court does not reach the
     less-thoroughly-briefed issue of the ALJ's failure to discuss certain Kaiser physical health records.

United States District Court
Northern District of California

1         The ALJ's failure to address the symptoms presented during T.W.'s therapy sessions

2   nevertheless raise concerns.  While ALJs are entrusted to evaluate the evidence and resolve

3   conflicts in the record, they are "not permitted to 'cherry-pick' from . . . mixed results to support a

4   denial of benefits."  *Garrison*, 759 F.3d at 1017 n.23 (quoting *Scott v. Astrue*, 647 F.3d 734, 739–

5   40 (7th Cir. 2011)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("Second, the

6   ALJ improperly cherry-picked some of Dr. Dees's characterizations of Ghanim's rapport and

7   demeanor instead of considering these factors in the context of Dr. Dees's diagnoses and

8   observations of impairment."); *Xiaomei Wang v. Saul*, No. 19-cv-03919-JSC, 2020 WL 5816889,

9   at *7 (N.D. Cal. Sept. 30, 2020) (reversing where an "ALJ improperly cherry-picked evidence that

10  supported his conclusion while ignoring medical evidence that contradicts his conclusion").  The

11  Ninth Circuit has held that an "ALJ is 'not required to discuss every piece of evidence,'" but it has

12  framed that rule as excusing discussion of "'evidence that is neither significant nor probative.'"

13  *Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) (citation omitted).

14        Here, the symptoms observed to during T.W.'s therapy were at least potentially probative

15  of mental impairments more significant than the non-severe impairments assessed by the ALJ

16  consisting of only mild limitations in interacting with others and managing oneself.  The ALJ

17  relied almost entirely on Dr. Kollath's psychological evaluation, which took place more than a

18  year before T.W. sought therapy due to her fear that she would "go crazy" without it.  *See id.* at

19  1058.  The ALJ briefly noted the "mostly normal mental status examinations" in T.R.'s treatment

20  records, AR at 19, but did not address the numerous reports documenting exceptions to normal

21  mental status, or T.W.'s clinicians' diagnoses of a number of mental disorders.  Despite the only

22  psychological opinion evidence (by Dr. Kollath and the non-examining consultants) predating

23  T.W.'s psychotherapy, the ALJ denied without explanation T.W.'s attorney's request to question a

24  psychiatric medical expert at a supplemental hearing—stating only that expert testimony was not

25  "necessary"—and instead held a supplemental hearing without medical testimony, the purpose of

26  which was not clear to anyone involved.  *See id.* at 36–38, 393.

27        The ALJ's failure to address MFTi Burns and LCSW Torres's treatment notes fits in a

28  pattern of cherry-picking evidence in this case favorable to the ALJ's conclusion while

disregarding without explanation evidence that might suggest disability.  For example, the ALJ cited Dr. Kollath's note that T.W. was "able to adequately provide her background information" as evidence that she lacked any limitation with respect to understanding, remembering, or applying information, *id.* at 18, but later cited Dr. Amgott-Kwan's conclusion that T.W. was "an inconsistent historian" to discredit her testimony regarding the frequency and severity of her seizures, migraines, and vertigo, *id.* at 22.  *See also id.* at 987 (documenting T.W.'s failure to recall an earlier diagnosis of endometriosis).  The background that T.W. provided to Dr. Kollath, which the ALJ considered "adequate," omitted her history of sexual abuse, suicidal ideation, and psychiatric hospitalization documented elsewhere in the record.  *Compare id.* at 658–59 (Dr. Kollath's report) *with, e.g.*, *id.* at 1230 (discussing childhood inpatient treatment for suicidal ideation).  The ALJ also relied on T.W.'s statement in her 2015 function report that she left her house for daily walks, *id.* at 18, without considering in this context T.W.'s more recent testimony at the 2017 and 2018 hearings that she only left her house one per week due to anxiety and other concerns, which the ALJ noted separately in his discussion of T.W.'s RFC and did not specifically discredit (or provide any reason to do so), *id.* at 21.

The ALJ therefore failed to address probative evidence regarding T.W.'s alleged mental impairments and impermissibly cherry-picked evidence to support the finding of non-disability.  That failure may have affected the ALJ's determination that no mental impairment was severe, credibility determinations, decision not to hear expert opinion evidence, assessment of T.W.'s RFC, and framing of hypotheticals for the VE, among other issues.  While it is not clear that the evidence, if considered, would require a finding of disability, the Commissioner must address on remand not only the evidence that supports a conclusion of non-disability, but also evidence tending to contradict it.  The Commissioner should consider whether further medical opinion evidence is necessary to understand the significance of T.W.'s treatment records and testimony regarding symptoms occurring years after Dr. Kollath's evaluation.

### E.    T.W. Waiver Her Appointments Clause Challenge

In *Lucia*, the Supreme Court held that administrative law judges employed by the Securities and Exchange Commission were "Officers of the United States" and had not been

1   appointed in a manner consistent with Article II of the Constitution.  *See generally Lucia*, 138 S.

2   Ct. 2044.  T.W. contends that the same is true here with respect to the Social Security

3   Administration's ALJs.  Pl.'s Mot. at 15–16.  The Commissioner argues that T.W. waived this

4   argument by failing to raise it in administrative proceedings.  Comm'r's Mot. at 12–13.  T.W.

5   contends that "it was factually impossible for [her] to raise this issue at her ALJ hearing" because

6   the Supreme Court had not yet decided *Lucia* at that time, and that the Supreme Court has held in

7   *Sims v. Apfel*, 530 U.S. 103, 107–10 (2000), that a Social Security claimant need not raise issues

8   before the Appeals Council to preserve them for judicial review.  Reply at 8.

9        As a starting point, it was not "factually impossible" for T.W. to raise an Appointments

10  Clause challenge during administrative proceedings.  The Appointments Clause has been part of

11  the Constitution since its ratification, and T.W. does not argue that the manner in which ALJs

12  were previously appointed was obscured from her.  The plaintiff in *Lucia* argued during

13  administrative proceedings that the ALJ was improperly appointed, despite the absence of

14  precedent endorsing that argument at the time.  *See* 138 S. Ct. at 2050.  T.W. could have done the

15  same here, but did not.

16       The Supreme Court's decision in *Sims* is also unavailing.  The Ninth Circuit has since

17  construed that case as addressing only whether an issue must be raised before the Appeals

18  Council, and not disturbing existing Ninth Circuit precedent requiring that an issue generally must

19  be raised before an ALJ in order to preserve it for judicial review.  *Shaibi v. Berryhill*, 883 F.3d

20  1102, 1109 (9th Cir. 2017).  This Court is bound by the precedential decision in *Shaibi*, and

21  therefore follows numerous other district court decisions in holding that, to preserve a

22  constitutional challenge to the manner in which an ALJ was appointed, a claimant must raise that

23  issue during administrative proceedings.  *See Julia R. G. v. Saul*, No. 19-cv-03426-DMR, 2021

24  WL 949423, at *6 (N.D. Cal. Mar. 12, 2021) (collecting cases).  Here, T.W. waived her

25  Appointments Clause challenge by failing to raise it to the agency before seeking judicial review.

26  **IV.   CONCLUSION**

27       For the reasons discussed above, the Commissioner's motion is DENIED, T.W.'s motion

28  is GRANTED in part, and the case is remanded for further proceedings consistent with this order.

1        T.W. requests that the case be remanded for further proceedings "with a different ALJ,"

2   but cites no authority for that request.  Pl.'s Mot. at 17; Reply at 8.  To the extent that request rests

3   on her Appointments Clause challenge and *Lucia*'s instruction to remand to a different adjudicator

4   in the case before the Supreme Court, *see* 138 S. Ct. at 2055, that decision is inapplicable because,

5   as discussed above, T.W. waived her Appointments Clause challenge by failing to raise it in the

6   administrative proceedings at issue.  The Court declines to specify the manner in which the

7   Commissioner must conduct further proceedings.

8        The Clerk shall enter judgment in favor of T.W. and close the case.

9        **IT IS SO ORDERED.**

10  Dated: March 30, 2021

11  

12  JOSEPH C. SPERO
    Chief Magistrate Judge

United States District Court
Northern District of California

34